**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

**MICHAEL P.,**

        **Plaintiff,**

  **v.**
                         **Civil Action 3:25-cv-00081**
                         **Judge Walter H. Rice**
                         **Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF
SOCIAL SECURITY,**

        **Defendant.**

**REPORT AND RECOMMENDATION**

Plaintiff, Michael P., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB"). For the following reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors (Doc. 10) and **AFFIRM** the Commissioner's decision

**I.      BACKGROUND**

On October 14, 2021, Plaintiff protectively filed and applied for DIB alleging disability beginning March 13, 2020, due to degenerative disc disease. (R. at 169–77, 181–87, 225). After his application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") heard the matter on September 20, 2023. (R. at 40–74). The ALJ denied Plaintiff's application in a written decision on December 20, 2023. (R. at 11–39). When the Appeals Council denied Plaintiff's request for review, that denial became the Commissioner's final decision. (R. at 1–6).

Plaintiff subsequently brought this action.  (Doc. 1).  As required, the Commissioner filed the administrative record (Doc. 7), and the parties briefed the issues.  (Docs. 10, 11, 14).

### A.        Relevant Hearing Testimony

The ALJ asked Plaintiff about his conditions and how they prevented him from working. Plaintiff replied as follows:

> At the hearing, [Plaintiff] testified that he stopped working as of the alleged onset date as he woke up and was unable to move and he could not move his left arm at all and was in extreme pain ... He said that he had degenerative disc disease for a long time and previously worked as a landscaper, but changed careers to being a respiratory therapist. He explained that the pain was in both arms, but worse on the left (he is right-handed).

> Concerning his functional abilities to date, [Plaintiff] testified to continued pain, numbness, and tingling in the left upper extremity. He said that his left upper extremity is much better than it was, but he still has some limitations. [Plaintiff] testified that he can lift about 20 to 30 pounds one time a day, but with pain. He said that he can lift only about 1 to 2 pounds frequently. [Plaintiff] testified that he can stand for about a couple minutes due to back and leg pain and that he can walk about the same amount of time. He said that he can sit for about 5 minutes at the time. [Plaintiff] testified that he can open a jar once, but not repetitively. ***

> As to his treatment, [Plaintiff] testified that he has undergone three rounds of physical therapy and three injections. He said that he has had some improvement in range of motion and in his ability to lift and carry. He said that he can get three injections a year and he experiences some relief, but it is not instant and it lasts about a couple months. [Plaintiff] testified that he has not had neck surgery.

> Concerning his headaches, [Plaintiff] testified that he has migraines continuously and pretty much daily. He described that, when having a migraine, he feels pressure in the back of the head and skull and that he sits in a dark room at least two times a week for the whole day. ***

> As to his work history, [Plaintiff] testified that he previously worked as a respiratory therapist. He explained that he did not stop work due to the COVID-19 pandemic, though noted that his injuries may have been caused in part by stress. He indicated that he received short-term and long-term disability once he stopped working, but this ended. [Plaintiff] testified that he could not return to his past work as a respiratory therapist due to the physical nature of the job.

> Concerning his daily living, [Plaintiff] testified that he lives in a house alone. He said that he drives, but a long car ride, such as driving to Florida, would be too much.

(R. at 22–23).

## B.    Relevant Medical Evidence

The ALJ summarized Plaintiff's medical records and symptoms as follows:

**2020**

Concerning the medical evidence, the record reflects that, shortly after the alleged onset date, in March 2020, [Plaintiff] presented at an urgent care visit and complained of severe pain in the left shoulder area and was administered a Toradol injection under the diagnosis of strain of left trapezius muscle (Ex 8F, 136, 137).

Thereafter, in June 2020, [Plaintiff] attended an orthopedic visit where he was assessed with neck pain, cervical stenosis of the spine, cervical radiculopathy, and degenerative disc disease of the cervical spine (Ex 2F, 46). He complained of chronic neck pain for years, that increased on March 15, 2020 (Ex 2F, 47). It was noted that [Plaintiff] had been seeing a chiropractor, which had not been helping his symptoms (Ex 2F, 48). Physical examination found that [Plaintiff] exhibited tenderness to palpitation in the spinous processes and his cervical range of motion was 40 degrees with flexion and 20 degrees with extension, but he had a normal gait pattern, full range of motion in both shoulders, and his coordination was intact (Ex 2F, 49). [Plaintiff]'s muscle strength was 3/5 in the deltoid, biceps, and triceps, with the right being stronger than the left, but it was normal bilaterally in the wrist extensors, finger extensors, finger flexors, and interosseus muscles (Ex 2F, 50). [Plaintiff] underwent X-rays of his cervical spine which revealed straight overall alignment of the cervical spine, with the lateral view demonstrating straightening of the cervical lordosis secondary to severe disc collapse at C5-6, and the adjacent levels appearing to be relatively normal and the flexion-extension views demonstrated no dynamic instability (Ex 2F, 54). Also, there was review of a MRI of [Plaintiff]'s cervical spine, taken in May 2020, which revealed that the sagittal sections demonstrated early degenerative changes at C4-5 and more most notably at C5-6 with broad-based disc herniation at C5-6 and that axial sections available for review demonstrating left foraminal disc herniation at C5-6 compromising the exiting C6 nerve root (Ex 2F, 50; Ex 26F, 3). At that time, [Plaintiff] was referred to pain management and physical therapy (Ex 2F, 52).

Later in June 2020, [Plaintiff] attended an initial physical therapy visit for complaints of neck pain with radicular symptoms bilaterally, left side worse than right (Ex 7F, 9). At that time, [Plaintiff]'s current level of function was that he exhibited decreased cervical range of motion and decreased bilateral upper extremity strength (Ex 7F, 10).

In July 2020, [Plaintiff] attended a pain center intake where he complained of pain in his neck, head, left shoulder, down the left arm, left hand, right forearm, and right hand and described his pain as aching, sharp, dull, shooting, tingling, constant in

3

his head (pressure), neck (sore, aching), and fingers (tingling), and said that other pain was intermittent (Ex 1F, 28). [Plaintiff] reported that this pain started around March 15th with no known cause (Ex 1F, 28). He detailed that he had tried medication as well as conservative therapies, including physical therapy and chiropractic treatment (Ex 1F, 28). Physical examination found that there was pain in the left cervical neck splenis capitis trapezius rhomboid muscles and that he retained 5 out of 5 muscle strength in the upper extremities and that he had normal motor function and normal sensory function, with no focal deficits noted (Ex 1F, 33). [Plaintiff] was diagnosed with a cervical disc bulge and cervical myofascial pain syndrome and opted to proceed with myoneural trigger point injections (Ex 1F, 36, 39).

At a pain center visit in August 2020, [Plaintiff] complained of continuing pain, though he said that everything was getting better, with slow improvement (Ex 1F, 21). At that time, [Plaintiff] underwent another trigger point injection (Ex 1F, 27). The next month, at a subsequent pain center visit in September 2020, [Plaintiff] reported that he received 50% pain relief with the trigger point injection and said that the pain in his arms had almost completely resolved, though there was some residual numbness in his hands (Ex 1F, 13, 17). At that time, [Plaintiff] opted to proceed with the third trigger point injection (Ex 1F, 17, 20).

Subsequently, at an orthopedic visit in September 2020, [Plaintiff] stated that his arm pain had resolved, though he had recurrent headaches (Ex 2F, 33). He said that he was participating in physical therapy and overall felt that he made some improvements in his condition and that he had undergone 3 sets of injections, which provided some relief as well (Ex 2F, 33).

Also in September 2020, [Plaintiff] attended a family medicine visit where he reported that his chronic neck pain symptoms were slowly improving, though he did not feel able to return to work at that time (Ex 4F, 3). Physical examination found a well-appearing male with improvement in range of motion with residual decreased range of motion to the left cervical spine with side bending (Ex 4F, 3).

In October 2020, [Plaintiff] attended a physical therapy visit where he reported that he continued to be a little better and had continued increases in overall neck motion and perceived improvements in posture and decrease in thoracic spine soreness and stiffness and decreased overall pain and decreased overall headaches, though he continued to report neck pain with bilateral radicular symptoms down the bilateral upper extremities into the bilateral hands/fingers, with the left being worse than the right (Ex 4F, 73). At that time, the assessment was that [Plaintiff] continued to exhibit improved cervical range of motion and improved bilateral upper extremity strength and noted that he indicated that he was not 100%, but therapy was helping (Ex 19F, 11).

4

**2021**

Later on, at a primary care visit in December 2021, [Plaintiff] indicated that he had previously undergone physical therapy over a year ago for his cervical spine and it was quite helpful and he requested a new referral (Ex 4F, 110-111). Otherwise, [Plaintiff] reported that he was doing well with Lexapro and that he had an improved and more leveled out mood (Ex 4F, 110).

Physical examination revealed that his neck with was reduced range of motion in all 6 directions and that his cervical spine pain was aggravated with Spurlings testing, though his grip strength was 5/5 bilaterally and he was grossly neurovascularly intact (Ex 4F, 111). Also, the mental status examination noted an ok mood and normal behavior (Ex 4F, 111). [Plaintiff] was diagnosed with depression and degenerative disc disease of the cervical spine (Ex 4F, 112).

**2022**

Thereafter, at a primary care visit in March 2022, [Plaintiff] indicated that his medication was working quite well in regards to his mental condition, with improved mood and absence of adverse effects (Ex 13F, 19). It was noted that [Plaintiff] had not been able to utilize physical therapy due to financial issues, but was utilizing home exercise in addition to relief factor supplementation and appreciating reasonable/satisfactory pain relief/control (Ex 13F, 20).

In July 2022, [Plaintiff] reported that he was taking Lexapro and found that this worked quite well, with improved mood and absence of adverse effects (Ex 4F, 27).

A few months later, at a medical visit in September 2022, [Plaintiff] complained of becoming hypotensive with fatigue and lightheadedness and presyncopal episodes due to his blood pressure medication, but said that these issues resolved with discontinuation of the medication (Ex 13F, 12; see also Ex 20F, 11). The mental status examination found that [Plaintiff] exhibited an ok mood with good assistive control on current SSRI dosage, normal behavior, and no suicidal or homicidal ideation (Ex 20F, 12).

Also, in September 2022, [Plaintiff] underwent a psychological consultative examination where he reported that he had undergone marital therapy, but never had individual mental health treatment and had never been psychiatrically hospitalized (Ex 14F, 2). He said that his depression had been at its worst a couple years prior, but had improved steadily since he had been on medication (Ex 14F, 3). He also described a history of unusual fluctuations in mood and that both he and his ex-wife suspected that he may have bipolar disorder (Ex 14F, 4). The examiner noted that [Plaintiff]'s speech was of a fast pace, he tended to ramble, and he seemed unusually cheerful for someone presenting for a psychological evaluation and that he was reportedly diagnosed with attention deficit hyperactivity disorder as a child but had not taken medication for this condition since he was in high school (Ex 14F, 4). Overall, [Plaintiff] was diagnosed with unspecified bipolar disorder (provisional) and alcohol use disorder, mild (Ex 14F, 5).

**2023**

In February 2023, [Plaintiff] underwent an internal medicine consultative examination where he complained of a history of heart attack in July 2022 as well as chronic neck pain, back pain down to the lateral thighs, left knee pain, migraines, and numbness in the left arm to the thumb and both fingers (Ex 21F, 3). He said that he used medical marijuana as well as ibuprofen, herbal supplements, turmeric, and BioFlex for his neck (Ex 21F, 3). [Plaintiff] indicated that he occasionally used a cane (Ex 21F, 3). At that time, [Plaintiff]'s blood pressure was 138/90 and the examiner noted that he appeared in pain (Ex 21F, 4). Physical examination found that [Plaintiff] had restricted range of motion in the cervical spine with tenderness on palpitation of the lower cervical spine (Ex 21F, 4). [Plaintiff] complained of numbness of the thumb and first 2 fingers bilaterally, but had strong grip strength and full range of motion in the wrists and elbows (Ex 21F, 4). [Plaintiff]'s range of motion was restricted bilaterally in the shoulders (Ex 21F, 4). [Plaintiff] had mildly restricted range of motion in the lumbar spine and, on SLR testing, he could not elevate more than a few inches bilaterally and complained of back pain (Ex 21F, 4). [Plaintiff]'s range of motion in the bilateral hips was restricted and he had restricted range of motion in the left knee (Ex 21F, 4). [Plaintiff]'s gait favored his left knee without ambulatory aids (Ex 21F, 4). Overall, the examiner found that [Plaintiff] had a history with a history of neck pain with symptoms suggestive of C7 radiculopathy and as well as chronic migraines related to the pain and noted that he was going to schedule an appointment for more trigger point injections (Ex 21F, 5). The examiner also found that [Plaintiff] appeared to have spinal stenosis and had pain radiating to his lateral thighs, though there was no neurosensory deficit in lumbar distribution (Ex 21F, 5). The examiner also noted that [Plaintiff] had left knee ACL instability and that he seemed to be in significant pain in all these places and that he also had a history of myocardial infarction and stent placement in LAD in July 2022 and there was no recurrence of chest pain, but his activity was limited and he missed his follow-up appointment with cardiology (Ex 21F, 5).

More recently, at a primary care visit in May 2023, [Plaintiff] requested a referral to neurosurgery for updated imaging and a plan of care (Ex 20F, 14). [Plaintiff] indicated that he stopped taking his Lexapro due to feeling numb and he did not want to be on more psychotropic medication and was agreeable to counseling, especially if it was via telehealth (Ex 20F, 15). [Plaintiff]'s diagnoses included recurrent major depressive disorder, in remission, as well as severe bipolar II disorder, recent episode major depression, partial remission, and anxiety, marijuana dependence, and alcohol dependence (Ex 20F, 15-16).

The most recent evidence includes a July 2023 neurosurgery visit where [Plaintiff] complained of neck and lower back pain, with the neck pain being worse than the back (Ex 26F, 9). [Plaintiff] described the pain as measuring a 5/10 on average and as having numbness and tingling in the great toes bilaterally, transient numbness and tingling in the bilateral arms and legs when lying down, and subjective weakness in the left upper extremity (Ex 26F, 9). It was noted that [Plaintiff] tried

6

physical therapy remotely, home exercises, and NSAIDS, without any significant or lasting relief of his symptoms (Ex 26F, 9). Physical examination found that [Plaintiff]'s upper extremity muscle strength was 5/5 in all areas except the left bicep, which was 4/5 (Ex 26F, 12). Also, [Plaintiff]'s gait was steady and smooth, his SLR test was negative bilaterally, and sensation was intact both proximally and distally in the bilateral upper and lower extremities with light tough, pinprick, and vibration (Ex 26F, 13). [Plaintiff] was diagnosed with cervical spondylosis and lumbar spondylosis and was referred to physical therapy (Ex 26F, 13).

(R. at 23–26) (headings added).

## C.     The ALJ's Decision

The ALJ found that Plaintiff meets the insured status requirements through December 31, 2025, and has not engaged in substantial gainful activity since the alleged onset date.  (R. at 16). The ALJ determined that Plaintiff has the following severe impairments: cervical spine degenerative disc disease, migraines, and depression.  (R. at 17).  Still, the ALJ found that Plaintiff's impairments, either singly or in combination, do not meet or medically equal a listed impairment.  (R. at 18).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ concluded:

[Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), with the following limitations: [Plaintiff] can lift and/or carry up to 20 pounds occasionally and 10 pounds frequently, and has no limitations in the total amount of time he is able to sit, stand or walk throughout an 8 hour workday. [Plaintiff] needs to alternate his position between sitting, standing, and walking for no more than five minutes out of every hour. While doing so, he would not need to be off task. [Plaintiff] can occasionally climb ramps and stairs, and he can occasionally stoop, balance, crouch and crawl, but he can never kneel or climb ladders, ropes or scaffolds. [Plaintiff] can perform fine and gross manipulation frequently but not constantly, and is incapable of forceful grasping or torquing. He can reach overhead frequently, but not constantly. He is not capable of working where he would be exposed to excessive noise or bright, flashing lights exceeding levels generally encountered in office-type work environments. [Plaintiff] is limited to working in non-hazardous environments, i.e., no driving at work, operating moving machinery, working at unprotected heights, and he should avoid concentrated exposure to unguarded hazardous machinery. [Plaintiff] can understand, remember and carry out simple instructions. [Plaintiff] can use judgment to make simple work-related decisions. [Plaintiff] can tolerate occasional interactions with supervisors and coworkers. [Plaintiff] can

7

tolerate no interactions with the general public. [Plaintiff] cannot perform work requiring a specific production rate such as assembly line work, but can tolerate end of day quotas. [Plaintiff] can deal with occasional changes in a routine work setting.

(R. at 21).

Relying on the vocational expert's testimony, the ALJ found that Plaintiff is unable to perform his past relevant work as a respiratory therapist. (R. at 30–31). But considering his age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff can perform at the light exertional level, such as a marker, photocopy machine operator, and office helper. (R. at 31–32). The ALJ thus concluded that Plaintiff was not disabled. (R. at 32).

## II.    STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence,

it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42

U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III.  DISCUSSION

Plaintiff contends that the ALJ improperly evaluated Zachary Townsend, D.O.'s and Brian

Moore, O.T.'s opinions, violating 20 C.F.R. § 404.1520c.  (Doc. 10 at 11–19).  Specifically, she

says the ALJ strayed from the regulation requiring supportability and consistency analyses.  (*See

generally id.*).  The Commissioner disagrees.  (Doc. 11 at 3–11).

### A.  Dr. Townsend

On September 11, 2020, roughly six months after Plaintiff's alleged onset date, Dr.

Townsend completed a form for purposes of private disability insurance.  "[P]er PT records," Dr.

Townsend opined that Plaintiff could never engage in sitting, standing, walking, lifting, carrying,

power grasping, fine manipulation, pushing, pulling, keyboarding, reaching above shoulder level,

reaching at waist level or below, bending, twisting, squatting, climbing, or balancing (R. at 598–

99).  Dr. Townsend expressly noted that he was unable to determine how long Plaintiff's ailments

would last and wanted to follow-up with Plaintiff in two weeks.  (R. 599).  Two months later, on

November 10, 2020, Dr. Townsend completed another form.  This time, Dr. Townsend found

Plaintiff's abilities had improved: "[P]er recs," Plaintiff could occasionally sit, stand, walk, and

lift or carry up to 10 pounds, but could never carry more than 10 pounds (R. at 633–34).  When

asked to offer a return-to-work plan, Dr. Townsend noted that Plaintiff was unable to work "at this

time," and Dr. Townsend wanted to assess Plaintiff again in two weeks.  (R. at 634).  The ALJ

found Dr. Townsend's opined limitations to be unpersuasive.  (R. at 30).

### 1.  Supportability

As to supportability, the ALJ noted that Dr. Townsend's forms were completed for the purpose of private disability insurance benefits; the forms were completed less than twelve months after the alleged onset date; and the forms had no indication of how long Plaintiff's conditions were expected to last and Dr. Townsend wanted to reassess Plaintiff.  (R. at 30).

Supportability requires the ALJ to evaluate how much the medical conclusions are supported internally, as well as by other treatment notes and exams by the evaluating medical provider.  20 CFR 404 § 1520c(c)(1); *Michael R. v. Comm'r of Soc. Sec.*, No. 2:22-CV-4117, 2023 WL 6160626, at *5 (S.D. Ohio Sept. 21, 2023) ("The ALJ properly evaluated the supportability of Ms. Riffle's opinion given the lack of objective evidence in the opinion itself and when compared to Ms. Riffle's past treatment notes."), *report and recommendation adopted*, No. 2:22-CV-4117 WL 688754 (S.D. Ohio Feb. 20, 2024); *see also Thomas J. v. Comm'r of Soc. Sec.*, No. 1:24-CV-00048, 2024 WL 3841221, at *10 (S.D. Ohio Aug. 15, 2024).  The ALJ did that.

To start, the ALJ found Dr. Townsend's reports unpersuasive because they did not say how long Plaintiff's limitations were expected to last.  Specifically, the ALJ said the reports contained "no indication of the assessments on these forms lasting or being expected to last for a continuous twelve-month period (they indicate plans to reassess the claimant)."  (R. at 30 (citing R. at 599)). Looking at the record, the ALJ's analysis is correct.  Dr. Townsend asserted that the duration of Plaintiff's limitations was "undetermined at present," and that he intended to find out more in two weeks.  (*Id.* (noting Townsend is "[u]nable to determine" how long these limitations are expected to last, with "follow-up in 2 weeks.")))  The ALJ properly discounted the opinion for these reasons.  *Drew v. Kijakazi*, No. 1:20CV01397, 2021 WL 4425783, at *7 (N.D. Ohio Sept. 27,

10

2021) (finding the ALJ evaluated supportability when "the ALJ noted that Dr. Fitzgerald's opinion does not indicate the duration of the listed restrictions").

Plaintiff argues there is no requirement that "a medical opinion be provided 12 months after a claimant's alleged disability onset." (Doc. 10 at 15). But this misses the point. Based upon the forms, Plaintiff appeared to have undergone significant improvement within a matter of two months—from being able to perform no physical activities whatsoever to occasional standing, walking, sitting, and lifting up to 10 pounds. (*Compare* R. at 598–99 *with* R. at 633–34). The ALJ reasonably considered this improvement as well as Dr. Townsend's uncertainty about how long Plaintiff's limitations would last to find Dr. Townsend's opinions unpersuasive.

Additionally, the ALJ found Dr. Townsend's supporting explanations lacking because they appeared to be "based primarily 'per PT records.'" (R. at 30 (citing R. at 590, 634)). In other words, the ALJ found that Dr. Townsend did not provide enough objective support for the severe limitations he prescribed. (*Id.*). The ALJ came to this conclusion, in part, by reviewing the physical therapy records himself and explaining that the records did not support extreme limitations. (*Id.* (citing, *e.g.*, R. at 431 (noting normal cervical spine alignment, normal gait, and normal heel and toe walking))). Said differently, the ALJ determined that the PT records did not support the extreme limitations offered by Dr. Townsend.

All told, the ALJ engaged in the supportability analysis contemplated by the regulations, and the Undersigned finds no error. *See Chyenne M. v. Comm'r of Soc. Sec.*, No. 2:23-CV-1475, 2024 WL 3466154, at *6 (S.D. Ohio July 18, 2024) ("The ALJ here reasonably found that Dr. Haynesworth's opinions were not supported because he failed to provide supporting explanations for the extreme limitations he gave."); *Michael R.*, 2023 WL 6160626, at *5 ("The ALJ properly

evaluated the supportability of Ms. Riffle's opinion given the lack of objective evidence in the opinion itself and when compared to Ms. Riffle's past treatment notes.").

       2.     *Consistency*

Plaintiff also argues that the ALJ failed to evaluate Dr. Townsend's opinion for consistency. (Doc. 10 at 16). Again, the Undersigned disagrees.

Unlike supportability, which requires the ALJ to compare medical conclusions to the evidence offered by the reporting physician herself, consistency requires the ALJ to compare the report's conclusions to the evidence offered in other sources in the record. 20 CFR 404 § 1520c(c)(2); *see also David W. v. Comm'r of Soc. Sec.*, No. 3:24-CV-00255, 2025 WL 841074, at *7 (S.D. Ohio Mar. 18, 2025) ("[T]he ALJ clearly evaluated the consistency of Dr. Swedberg's opinion by comparing his findings to other medical evidence and Plaintiff's subjective accounts of his symptoms. That is all the ALJ had to do.").

Here, the ALJ directly compared Dr. Townsend's conclusions to the record as a whole. He noted that "the record overall does not actually document such significant limitations on an ongoing basis to support greater limitations." (R. at 30 (citing, *e.g.*, R. at 347, 363–364, 409, 431, 439, 447, 1614–1615, 1969)). The ALJ then cited portions of the record showing normal exam findings. (*Id.*). Elsewhere, the ALJ analyzed these same records. By explicitly citing them, the ALJ incorporated his prior discussions of the records into his consistency analysis. *Cari A. H-R. v. O'Malley*, No. 3:23-CV-00678-RSE, 2025 WL 644279, at *8 (W.D. Ky. Feb. 27, 2025) ("Again, by explicitly referencing the evidence previously cited in her opinion, ALJ Thomas identified the evidence she was relying on in assessing consistency."). Where Dr. Townsend said Plaintiff could "never" sit or stand, the ALJ cited records that he previously explained showed Plaintiff's "intact gait," "normal motor function," and "strength in his extremities." (R. at 30 (citing R. at 347, 363–

64, 409, 439, 447, 1969); R. at 18 (citing the same)).  The ALJ also cited records that he previously said were unsupportive of Plaintiff needing an ambulatory device.  (R. at 30 (citing R. at 1614–15)).

Plaintiff deems the ALJ's analysis "conclusory."  (Doc. 10 at 16).  But the ALJ's analysis need not rest within the confines of the single paragraph Plaintiff cites.  Nor must the Undersigned limit her evaluation to a single section of the ALJ's opinion.  Rather, the Undersigned may look to the opinion as a whole to determine if the ALJ evaluated it for consistency.  *Knece v. Comm'r of Soc. Sec.*, No. 2:14-CV-353, 2015 WL 4720793, at *11 (S.D. Ohio Aug. 7, 2015) ("Nonetheless, in looking at the decision as a whole, the Undersigned can glean the evidence upon which the ALJ relied in discounting Dr. Fouts' opinions."), *report and recommendation adopted*, No. 2:14-CV-353, 2015 WL 5162493 (S.D. Ohio Sept. 3, 2015); *see also Vaughn v. Comm'r of Soc. Sec.*, No. 20-CV-1119-TMP, 2021 WL 3056108, at *9 (W.D. Tenn. July 20, 2021) ("Therefore, the court finds that the ALJ provided a coherent, albeit brief, explanation as to her consideration of the consistency factor.").  A holistic reading of the ALJ's decision—including his explicit citations and his previous discussions of the records—show that the ALJ properly evaluated Dr. Townsend's opinion for consistency.

### B.    Mr. Moore

Next, Plaintiff claims the ALJ failed to evaluate supportability and consistency, this time, as applied to the opinion of occupational therapist Brian Moore.  Mr. Moore conducted a functional capacity analysis of Plaintiff, focusing mainly on his cervical spine issues.  (R. at 1652–53).  Based on this assessment, Mr. Moore limited Plaintiff to sedentary work.  (R. at 1653).

The ALJ discussed the Functional Capacity Evaluation assessment as follows:

In July 2022, [Plaintiff] underwent a Functional Capacity Evaluation where the assessment was that [Plaintiff] was able to demonstrate some physical capabilities within the sedentary category, but that he was not able to demonstrate such work

13

demands on a frequent basis (Ex 22F, 33). However, I do not find the results of this testing to be persuasive. It is noted that this evaluation was done the same month as [Plaintiff]'s myocardial infarction and the record reflects that [Plaintiff]'s cardiac condition subsequently improved. At that time, [Plaintiff] was not able to complete the treadmill testing for the prediction of aerobic capacity, but, post cardiac rehab, [Plaintiff]'s treatment notes show that he demonstrated increased exercise tolerance through increased workloads and exercise duration and that he was able to exercise at 3 METS and complete a total exercise duration of 51 minutes at the time of discharge (see Ex 22F, 5, 6). Moreover, the results of the functional capacity evaluation noted that [Plaintiff] demonstrated some inconsistency during the testing (see Ex 22F, 34). Overall, I do not find this evaluation persuasive to suggest greater limitations than set forth in the residual functional capacity above lasting or being expected to last for a continuous twelve month period.

(R. at 29).

### 1. Supportability

Plaintiff says the ALJ failed to evaluate Moore's opinion for supportability. As a reminder, supportability requires the ALJ to evaluate how much the medical conclusions are supported internally, as well as by other treatment notes and exams by the evaluating physician. 20 CFR 404 § 1520c(c)(1); *Michael R.*, 2023 WL 6160626, at *5.

Here, the ALJ evaluated supportability by noting that Plaintiff demonstrated "some inconsistency during the testing." (R. at 29 (citing R. at 1653)). Indeed, the assessment says that Plaintiff "demonstrated some inconsistency during testing with 13 out of 18 measures for isometric consistency with a coefficient of variation less than 15%" and that he had "2 out of 2 average grip score." (R. at 1653). Plaintiff was not able to complete his treadmill test to determine aerobic capacity. (*Id.*). And most of Plaintiff's general motion "appear[ed] slow and ataxic." (*Id.*). By pointing out that the inconsistent results did not support severe limitations, the ALJ evaluated the opinion for supportability. *Peters v. O'Malley*, No. 6:24-CV-11-REW, 2024 WL 5077599, at *4–5 (E.D. Ky. Dec. 10, 2024) (explaining that the medical provider's "opinions suffer[ed] from internal inconsistencies," which was "a valid reason for finding the opinion unsupported," as

14

"[t]hese internal contradictions between assessment and opinion plausibly go to the heart of supportability").

Still, Plaintiff argues that other portions of the opinion support Moore's conclusions. (Doc. 10 at 18). But "[i]t is well-settled that an ALJ need not evaluate each part of an opinion to show that the entire opinion was considered and properly discredited." *Alphonso R. v. Comm'r of Soc. Sec.*, No. 2:23-CV-11085, 2024 WL 4482519 (E.D. Mich. July 17, 2024) (citing *Bayes v. Comm'r of Soc. Sec.*, 757 F. App'x 436, 445 (6th Cir. 2018)), *report and recommendation adopted*, No. 23-CV-11085, 2024 WL 4182918 (E.D. Mich. Sept. 13, 2024). Instead, the ALJ the offered sufficient reasons for finding Mr. Moore's opinion unsupported.

### 2. Consistency

Finally, Plaintiff argues that the ALJ failed to evaluate Mr. Moore's opinion for consistency. Again, consistency requires the ALJ to compare the report's conclusions to the evidence offered in other sources in the record. 20 CFR 404 § 1520c(c)(2); *see also David W.*, 2025 WL 841074, at *7.

The ALJ began by noting that Mr. Moore's examination took place in the same month as Plaintiff's myocardial infarction, but that his condition later improved. (R. at 29 (citing R. at 1624–25)). In Mr. Moore's July 2022 exam, for example, Plaintiff was unable to complete his treadmill testing. (*Id.* (citing R. at 1653)). But after attending cardiac rehab, Plaintiff was able to increase his exercise tolerance. (*Id.*). Within three months of Mr. Moore's assessment, Plaintiff was newly able to "exercise at 3 METS and complete a total exercise duration of 51 minutes at the time of discharge." (*Id.*). This improvement, said the ALJ, was inconsistent with Moore's initial proposed limitations of sedentary work. (*Id.*). By comparing the proposed limitations to later records, the ALJ properly evaluated consistency. *David W.* 2025 WL 841074, at *7.

Plaintiff retorts that his improvement to 3 METS and 51 minutes on the treadmill does not

render the opinion inconsistent with the record "or establish that Plaintiff could perform light work activity for a full eight-hour day." (Doc. 10 at 18). Plaintiff points to the regulations that state a score of 3 METS is not indicative of significant functional ability. (*Id.* (citing 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 4.02.)). But the ALJ did not say that it was. Rather, the ALJ found that Plaintiff's condition improved to 3 METS and increased from no time on the treadmill to 51 minutes on the treadmill. (R. at 29 (citing 1653)). It was this improvement to 3 METS—and not the meaning of that score—that rendered Moore's opinion inconsistent with other medical evidence. (*Id.*). In other words, Plaintiff's improvement mattered and undermined the validity of Mr. Moore's assessment. The ALJ did not err in coming to that conclusion.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors (Doc. 10) and **AFFIRM** the Commissioner's decision.

## <u>PROCEDURE ON OBJECTIONS</u>

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Date: February 12, 2026

*s/ Kimberly A. Jolson*

KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE